UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALEGENT HEALTH – IMMANUEL )
MEDICAL CENTER, )
 )
 )
Plaintiff, )
 )
v. ) Civil Case No. 12-812 (RJL)
 )
KATHLEEN SEBELIUS, *Secretary*, )
*Department of Health and Human Services*, )
 )
Defendant. )

**MEMORANDUM OPINION**
(March 31, 2014) (Dkt. ##15, 18)

Plaintiff Alegent Health – Immanuel Medical Center ("Alegent" or "plaintiff") brought this action against Kathleen Sebelius ("Secretary"), in her official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), pursuant to 42 U.S.C. § 1395 *et seq.*, seeking judicial review of the Secretary's denial of reimbursements for costs associated with offsite medical resident training during the fiscal years ending on June 30, 2002 and June 30, 2003. *See* Compl. [Dkt. #1]. Before the Court are the parties' cross-motions for summary judgment. Upon consideration of the parties' pleadings, relevant law, and the entire record in this case, defendant's Motion for Summary Judgment [Dkt. #18] is GRANTED and plaintiff's Motion for Summary Judgment [Dkt. #15] is DENIED.

1

## BACKGROUND

A. **Statutory and Regulatory Background**

The Medicare Act provides health insurance benefits to eligible elderly and disabled persons. *See* 42 U.S.C. § 1395 *et seq*. The Centers for Medicare and Medicaid Services ("CMS") administers the program for the Secretary. *See* 42 U.S.C. § 1395kk; 42 C.F.R. § 400.200 *et seq*. Medicare Part A serves as insurance for hospital care, related post-hospital care, home health services, and hospice care. *See* 42 U.S.C. § 1395c *et seq*. The Secretary contracts with fiscal intermediaries to determine and process payments to hospitals. *See* 42 U.S.C. § 1395h. At the close of the fiscal year, a participating hospital submits a cost report to its intermediary. *See* 42 C.F.R. §§ 413.20, 413.24. After auditing the report, the intermediary issues a Notice of Program Reimbursement ("NPR"). *See* 42 C.F.R. § 405.1803. A hospital may challenge an NPR by requesting a hearing before the Provider Reimbursement Review Board ("PRRB"). *See* 42 U.S.C. § 1395oo(a). The PRRB's decision is subject to review by the CMS Administrator ("Administrator"). *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875(a). The Administrator's decision constitutes a final agency decision subject to judicial review. *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875.

Hospitals are paid standardized rates for designated hospital-provided outpatient services, subject to payment adjustments and additional payments for particular types of costs. *See* 42 C.F.R. § 419.2. Under Part A of the Medicare program, hospitals that

operate approved medical residency programs are entitled to reimbursement for certain costs related to graduate medical education. Medicare makes both a direct graduate medical education ("DGME") payment and an indirect graduate medical education ("IME") payment. *See* 42 U.S.C. §§ 1395ww(d)(5)(B), (h). DGME costs include residents' salaries and fringe benefits, as well as compensation paid to teaching physicians and supervisors. *See* 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86(b)(3) (1998). IME costs include higher-than-average operating costs incurred as an indirect result of having a teaching program. *See* 42 U.S.C. §§ 1395f(b), 1395ww(d)(5)(B); 42 C.F.R. § 412.105 (1998).

The standard payment rates, however, do not include reimbursement for DGME costs. *See* 42 C.F.R. §§ 412.2(a)(1), 419.2(f)(7), 412.1(c)(1). CMS pays hospitals a separate payment for DGME costs, as determined pursuant to 42 C.F.R. § 413.86(d) (1998). The amount of these payments are determined annually and are based on the "average per resident amount" payment methodology. *See* 42 U.S.C. § 1395ww(h). The DGME payment is equal to the product of the hospital's average per resident amount—derived from a 1984 base period—times the number of full-time equivalent medical residents ("FTE") in approved residency programs during the cost reporting period, times the hospital's Medicare patient load.[1] *See* 42 U.S.C. § 1395ww(h)(3).

---

[1] Generally, a hospital's Medicare patient load is a percentage of the hospital's total inpatient-bed-days attributable to Medicare patients for that cost reporting period. *See* 42 U.S.C. § 1395ww(h)(3)(C).

3

Additional payments are also made for IME, the amounts of which also vary by the number of FTEs in a hospital's residency programs, as well the number of beds the hospital has. *See* 42 U.S.C. § 1395ww(d)(5)(B)(ii).

Pursuant to the Balanced Budget Act of 1997 ("BBA"), the Secretary imposed caps on the number of FTEs a hospital could claim, with some exceptions, using 1996 as the base year. *See* Pub. L. No. 105-33; 42 U.S.C. § 1395ww(h)(4)(F). The caps limit the number of FTEs for which a hospital can claim DGME/IME reimbursement to the number of FTEs claimed by the hospital for the last cost reporting period ending on or before December 31, 1996.[2] *See* Pub. L. No. 105-33; 42 U.S.C. § 1395ww(h)(4)(F). It goes without saying that the higher the number of FTEs a hospital is able to claim, the larger the amount of potential reimbursement payment it might receive.

The BBA contained certain exemptions to the FTE caps placed on hospitals seeking reimbursement for DGME/IME expenses. For instance, the BBA permitted the Secretary to prescribe rules allowing hospitals that are members of the same "affiliated group"—as defined by the Secretary—to apply their FTE caps on an aggregate basis. *See* 42 U.S.C. § 1395ww(h)(4)(H)(ii). The BBA also directed the Secretary to prescribe rules for the application of FTE caps to new medical residency training programs established on or after January 1, 1995. *See* 42 U.S.C. § 1395ww(d)(h)(H)(i).

---

[2] For example, if a hospital claimed 25 FTEs for the cost reporting period ending December 31, 1996, then its number of FTEs for the purpose of DGME/IME reimbursement payments was capped as of October 1, 1997 at 25. *See* Pub. L. No. 105-33; 42 U.S.C. § 1395ww(h)(4)(F).

4

On August 29, 1997, the Secretary—through CMS—issued regulations implementing the BBA's changes to DGME and IME reimbursements, including the application of FTE caps, in an interim final rule with comment period published in the Federal Register. *See* 62 Fed. Reg. 45966. The regulations promulgated by the 1997 rule provided that "[h]ospitals that are part of the same affiliated group may elect to apply the [FTE] limit on an aggregate basis."[3] 42 C.F.R. § 413.86(g)(4) (1997). The 1997 rule also provided for adjustments to hospitals' FTE caps for new medical residency programs, to include instances where "a hospital had no residents before January 1, 1995, and it establishe[d] a new medical residency training program on or after that date." 42 C.F.R. § 413.86(g)(6)(i) (1997).

On May 12, 1998, the Secretary issued a final rule responding to comments received regarding the August 29, 1997 interim final rule and addressing the application of FTE caps. *See* 63 Fed. Reg. 26318. The regulations in the 1998 final rule allowed the application of FTE caps on an aggregate basis for hospitals in affiliated groups,[4] and also continued to provide for adjustments to a hospital's FTE caps for new medical residency programs. *See* 42 C.F.R. § 413.86(g)(4), (6) (1998). In addition, the

---

[3] The regulations defined an affiliated group as "two or more hospitals located in the same geographic wage area (as that term is used . . . for the prospective payment system) in which individual residents work at each of the hospitals." 42 C.F.R. § 413.86(b) (1997).

[4] The 1998 final rule slightly amended the definition of "affiliated group," defining it, in pertinent part, as "(1) Two or more hospitals located in the same urban or rural area . . . or in contiguous areas if individual residents work at each of the hospitals during the course of the program; or . . . (3) The hospitals are under common ownership." 42 C.F.R. § 413.86(b) (1998).

preamble to the 1998 final rule stated that affiliated groups wishing to apply their FTE caps on an aggregate basis were required to submit a written affiliation agreement[5] to the Secretary and their fiscal intermediaries. *See* 63 Fed. Reg. at 26338-26339, 26341. In 2002, the Secretary amended 42 C.F.R. § 413.86(b) to include the detailed requirements for affiliation agreements contained in the preamble of the 1998 final rule. *See* 67 Fed. Reg. 49982, 50069 (Aug. 1, 2002).

### B. Factual and Procedural Background

Alegent Health – Immanuel Medical Center is a not-for-profit, general acute care hospital located in Omaha, Nebraska. *See* Administrative Record ("AR") at 148-149; Compl. at ¶ 6. Alegent is owned and operated by Alegent Health, a non-profit health care system in Southeast Nebraska and Southwest Iowa. *See* AR at 148-49. Creighton University ("Creighton") is a private university that is also located in Omaha. *See* AR at

---

[5] The preamble to the 1998 final rule laid out detailed requirements for affiliation agreements:

> Each agreement must be for a minimum of one year and may specify the adjustment to each respective hospital cap under an aggregate cap in the event the agreement terminates, dissolves or, if the agreement is for a specific time period, for residency training years and cost reporting periods subsequent to the period of the agreement . . .
>
> Each agreement must specify that any positive adjustment for one hospital must be offset by a negative adjustment for the other hospital of at least the same amount.
>
> The original agreements must be signed and dated by representatives of each respective hospital that is a party to the agreement . . . .

63 Fed. Reg. at 26341.

107. Creighton's medical school, like most medical schools in the United States, sends its third and fourth year medical students to participate in residency training programs in local hospitals in order to gain clinical experience. *See* Def.'s Mot. Summ. J. at 8, AR at 19.

Prior to July 1998, Creighton's psychiatric residency training program took place at Creighton St. Joseph Regional Healthcare System, LLC ("St. Joseph"). *See* AR at 19, 149-50, 483, 491. St. Joseph had an FTE cap of 145.39 for IME and 165.45 for DGME, as established by the cost reporting period ending on May 31, 1996. *See* AR at 19. In 1997, St. Joseph informed Creighton that it would no longer be able to fulfill its responsibilities as the school's training site, causing Creighton to approach plaintiff about becoming the new primary training site for its psychiatric residency training program. *See* AR at 149, 491.

Because Alegent had not previously participated in any medical residency training program, it had a cap of zero FTEs. *See* AR at 19. In an effort to raise the number of FTEs plaintiff could claim, and thus raise the potential level of Medicare reimbursement, Alegent and St. Joseph agreed to form an affiliated group. *See* AR at 19, 149, 491. On June 30, 1998, the parties entered into an academic affiliation agreement ("Agreement"), and plaintiff became the primary site for Creighton's residency training program. *See* AR at 19-20. By doing so, Alegent and St. Joseph were able to apply the FTE caps on an

aggregate basis, thereby allowing Alegent access to a Medicare reimbursement it would otherwise not have been entitled to receive. *See id.*

Following an audit of plaintiff's cost reports for its fiscal years ending June 30, 1999 through June 30, 2002, the fiscal intermediary determined that the Agreement satisfied the requirements for establishing an affiliated group for the purpose of applying FTE caps on an aggregate basis. *See* AR at 20. Furthermore, the intermediary determined that plaintiff's medical residency program was a "new program," and allowed reimbursement on that basis through June 30, 2001. *See id.* However, during a subsequent audit of plaintiff's cost report for its fiscal year ending June 30, 2003, the intermediary determined that the Agreement was insufficient under the regulations because it was an academic affiliation agreement rather than an FTE sharing agreement, and thus did not expressly contemplate the application of St. Joseph's FTE caps on an aggregate basis. *See id.* Following this determination, the fiscal intermediary disallowed all IME and DGME payments claimed by plaintiff pursuant to the Agreement for the fiscal years ending June 30, 2000 through June 30, 2003. *See id.*

Alegent appealed the intermediary's determination to the PRRB. *See* AR at 1254-55. Alegent argued that requiring a written affiliation agreement prior to 2002 was contrary to the regulations in place and therefore violated the Administrative Procedure Act ("APA"). *See* AR at 20-22. It also argued that requiring a written affiliation agreement violated the Paperwork Reduction Act ("PRA") because HHS did not get

Office of Management and Budget ("OMB") approval before making the request. *See* AR at 22. Finally, Alegent argued that the Secretary should be estopped from denying it reimbursement because plaintiff relied, to its detriment, on the findings of the fiscal intermediary that Alegent qualified for adjustments to the FTE caps because it qualified a new medical residency program.

The PRRB reversed the intermediary's determination regarding the fiscal years ending on June 30, 2000 and June 30, 2001, but affirmed the intermediary's determination regarding the fiscal years ending on June 20, 2002 and June 30, 2003. *See* AR at 16-28. The PRRB determined that the Agreement satisfied the requirements for creating an affiliated group for the fiscal years ending on June 30, 2000 and June 30, 2001, allowing Alegent and St. Joseph to apply their FTE caps on an aggregate basis for those cost reporting periods, but that the agreement lapsed without renewal in 2001. *See* AR at 27. The PRRB determined that there was no valid affiliation agreement in place for fiscal years 2002 and 2003, and thus Alegent and St. Joseph could not aggregate their FTE caps for those periods. *See id.* The PRRB concluded that the Secretary's actions were "consistent with his authority under the statute and do not constitute a violation of the APA." *Id.* It did not, however, reach any conclusions regarding plaintiff's equitable estoppel claim, nor did it expressly address plaintiff's PRA claims. *See id.*

The CMS Office of Attorney Advisor notified plaintiff and the fiscal intermediary in writing on February 2, 2012 that it would review the PRRB's decision. *See* AR at 8.

9

However, on March 20, 2012, the Administrator sent plaintiff and the intermediary a second letter informing them that it had declined to review the decision. *See* AR at 1. By declining to review the PRRB's decision under the circumstances, the Administrator effectively affirmed the PRRB's decision, thereby making it the final decision of the Secretary in this matter. *See* 42 C.F.R. § 405.1877(b)(4) (2008). Alegent appealed that decision to this Court.

## STANDARD OF REVIEW

The Medicare Act provides for judicial review of the Secretary's final decision under the Administrative Procedure Act. *See* 42 U.S.C. § 1395oo(f)(1). Under the APA's strict standard of review, the Court must set aside agency actions, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, an agency action "may be invalidated . . . if [it is] not rational and based on consideration of the relevant factors." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–16 (1971)). Factual conclusions are reviewed under the substantial evidence standard and may be overturned where they are "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E); *see also Overton Park*, 401 U.S. at 414. The Supreme Court has "defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* at 620. In applying the substantial evidence standard, the reviewing court may not "displace . . . [a] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

The Supreme Court has established a two-step framework for reviewing an agency's interpretation of a statute that the agency administers. *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984). Under the first step, the Court must look at the statute to determine whether Congress has "directly spoken to the precise question at issue." *Id.* at 842. If it has, "that is the end of the matter." *Id.* If, however, "the statute is silent or ambiguous with respect to the specific issue," the court proceeds to *Chevron* step two, and must determine whether the agency's interpretation is "based on a permissible construction of the statute." *Id.* at 843. Under this second step, the Secretary's statutory interpretation will be given controlling weight so long as it falls "within the bounds of reasonable interpretation." *Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 453 (1999). The Secretary's interpretation of the statute "need

not be the only reasonable one" in order to be upheld. *Conn. Dep't of Income Maint. v. Heckler*, 471 U.S. 524, 532 (1985). Where a Medicare statutory provision is subject to multiple reasonable interpretations, courts defer to the Secretary's interpretation. *See Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 295 (D.C. Cir. 2013).

When the agency action at issue involves "the construction of an administrative regulation rather than a statute . . . deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16 (1965). "[T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotations and citation omitted). In other words, a court "must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Id.* (internal quotations and citation omitted). Not surprisingly, the more complex a regulatory program is, the greater the deference owed. *See id.*; *see also Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994) ("[I]n framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute. That complexity adds to the deference which is due to the Secretary's decision.").

## ANALYSIS

The PRRB's—and therefore the Secretary's—final determination was that "[b]oth the Federal Register and the regulations in effect at the time made a written agreement necessary to qualify as an affiliated group." AR at 27. Indeed, the requirement for a written affiliation agreement is evident from the clear language of the preamble to the 1998 final rule. *See generally Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996) (preamble language has independent legal effect when an agency "inten[ds] to bind either itself or regulated parties"). Specifically, the May 12, 1998 Federal Register stated that "[h]ospitals that qualify to be members of the same affiliated group for the current residency training year and elect an aggregate cap *must provide an agreement* . . . ." 63 Fed. Reg. 26318, 26341 (emphasis added); *see also* AR at 26-27. The Secretary's interpretation of that regulation "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512 (internal quotations and citation omitted). Given the plain language of the preamble and the deference owed to the Secretary's interpretation of it, Alegent's argument that a written affiliation agreement is *not* required is, to say the least, incredible.

There is, of course, no dispute here that Alegent failed to enter into a written affiliation agreement for its fiscal years 2002 and 2003. *See* AR at 27. Instead, plaintiff argues that a written affiliation agreement is not required to qualify as an affiliated group

13

and to apply FTE caps on an aggregate basis because the Secretary's requirement for a Medicare affiliation agreement is invalid and should be set aside as violative of the Paperwork Reduction Act. *See* Pl.'s Mot. Summ. J. ("Pl.'s Mot.") at 2; *see also* 44 U.S.C. § 3512. Plaintiff further argues that the requirement for a Medicare affiliation agreement prior to October 1, 2002 is invalid because the imposition of such a requirement violates the Medicare statute and the APA. *See* Pl.'s Mot. at 2. Lastly, Alegent argues that the Secretary must be estopped from denying DGME and IME reimbursement for fiscal years 2002 and 2003 because plaintiff reasonably relied, to its detriment, on the fiscal intermediary's prior determinations that DGME and IME reimbursements were proper. *See id.* at 3, 39-44. Unfortunately for the plaintiff, none of these arguments is convincing. How so?

**A.     The Paperwork Reduction Act**

Plaintiff's argument that the PRA prevents the Secretary from requiring written affiliation agreements because she had not previously obtained approval from OMB fails for two reasons. First, the PRA does not create a private right of action and, even if it did, the requirement for a written affiliation agreement falls within the PRA's exemptions for administrative actions and audits. *See* 44 U.S.C. § 3518(c)(1)(B)(ii).

Put simply, the purpose of the PRA is to control the amount of paperwork the federal government can require of private businesses, educational institutions, federal

contractors, state and local governments and individuals.[6]  *See* 44 U.S.C. § 3501(1).
Specifically, the PRA states that "[a]n agency shall not conduct or sponsor the collection of information unless" it has conducted notice and comment rulemaking and received prior approval from OMB.  *See* 44 U.S.C. §§ 3507(a)-(c); 5 C.F.R. § 1320.5(a)(2).  The PRA further states, however, that "[t]he protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto," 44 U.S.C. § 3512(b), and that "no person shall be subject to any penalty for failing to comply," 44 U.S.C. § 3512(a).

Those federal courts that have addressed the PRA have confirmed what the plain language of the statute already makes clear:  the PRA may be raised as a *defense* to an agency action, but *does not create* a private cause of action.  *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999) ("As is apparent from [44 U.S.C. § 3512(b)], the Act authorizes its protections to be used as a *defense*" and "does not authorize a private right of action.") (emphasis in original); *Tozzi v. EPA*, 148 F. Supp. 2d 35, 43 (D.D.C. 2001) (noting that "courts that have addressed the issue have consistently held that there is not a private right of action under the PRA," and collecting cases). Alegent is not attempting here to use the PRA as a shield against the penalty that the

---

[6] In order for the PRA to apply, the challenged agency action or policy "must impose a reporting requirement" on recipients.  *See Benkelman Tel. Co. v. FCC*, 220 F.3d 601, 607 (D.C. Cir. 2000) (internal quotations omitted) (citing *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25, 33 (D.C. Cir.

Secretary has imposed on it, but a sword to persuade the Court to find the Secretary in violation of the PRA. Unfortunately for the plaintiff, there is no basis in the statue or relevant case law for such a use—Alegent's PRA claim must therefore fail.

**B.  The Medicare Statute**

Next, Alegent's argument is equally unavailing that the PRRB erroneously found that a written affiliation agreement was required and that Alegent did not meet the requirements for sharing FTE caps as a member of an affiliated group for fiscal years 2002 and 2003. Indeed, Alegent's position is inconsistent with both the law and the facts.

The BBA explicitly grants the Secretary the authority to define an affiliated group for the purpose of reimbursement under the Medicare statute. *See* 42 U.S.C. § 1395ww(h)(4)(H)(ii) ("The Secretary may prescribe rules which allow institutions which are members of the same affiliated group (*as defined by the Secretary*) to elect to apply [FTE caps] on an aggregate basis." (emphasis added)). Moreover, the Medicare statute clearly states that payments shall not be made "to any provider unless it has furnished such information *as the Secretary may request* in order to determine the amounts due such provider." 42 U.S.C. § 1395g(a) (emphasis added).

However, whether or not a written affiliation agreement is required in order to aggregate FTE caps as an affiliated group is not specifically addressed in either the

---

1998)).

Medicare statute or the BBA. *See Chevron*, 467 U.S. at 842. Thus, under *Chevron* step two, I must determine whether the Secretary's interpretation "is based on a permissible construction of the statute." *Id.* at 843. I find that it is. The Secretary's interpretation need only fall "within the bounds of reasonable interpretation," *Your Home Visiting Nurse Servs., Inc.*, 525 U.S. at 453, and "need not be the only reasonable [interpretation]" in order to be upheld, *Conn. Dep't of Income Maint.*, 471 U.S. at 532. The Secretary's interpretation that the statute gives her the authority to define the requirements for qualifying as an affiliated group easily clears this low threshold of reasonableness. Indeed, any interpretation that *did not* require a written affiliation agreement—given the complex nature of the reimbursement scheme and the thousands of hospitals participating in it—strikes me as unreasonable. Therefore the requirement for a written affiliation agreement as a prerequisite to aggregating FTE caps does *not* violate the Medicare statute.

## C. The Administrative Procedure Act

Alegent next argues that the requirement for a written affiliation agreement, prior to 2002, violates the APA because it was promulgated without appropriate notice and comment rulemaking. *See* Pl.'s Mot. at 33. I disagree.

On August 29, 1997, the Secretary issued a notice of interim final rulemaking including a definition of an affiliated group and providing for aggregation of FTE caps. *See* 42 C.F.R. § 413.86(b) (1997). The Secretary received many comments on the

proposed regulation, including suggestions that CMS should "permit hospitals to aggregate resident numbers at the program level if the hospitals provide supporting documentation that the aggregate count of residents within the program remains unchanged." 63 Fed. Reg. 26318, 26338. Agreeing with the sentiments of the commenters—but concerned about the administrative feasibility of monitoring aggregate FTE caps under affiliation agreements—the Secretary concluded that "the only way for aggregate FTE caps to be reconciled based on multiple agreements between hospitals is for each agreement to be sent to each hospital's fiscal intermediary." *Id.* at 26340.

The fact that the affiliation agreement requirement was located in the preamble to the 1998 final rule is of no consequence. *See Kennecott Utah Copper Corp.*, 88 F.3d at 1223. The relevant inquiry is whether the Secretary "fairly appraised" the public of the possibility of changes in the final language of the regulation, and whether those changes are logical outgrowth of the originally noticed rule. *See, e.g., Shell Oil Co. v. EPA*, 950 F.2d 741, 750-51 (D.C. Cir. 1991); *see also Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 533 (D.C. Cir. 1982) ("The agency need not renotice [sic] changes that follow logically from or that reasonably develop the rules it proposed originally."). She did when she decided they were. Moreover, the Secretary issued her rule requiring written affiliation agreements for hospitals wishing to apply their FTE caps on an aggregate basis *following* a period of notice and comment rulemaking. Thus, this claim by Alegent must also fail.

### D. Equitable Estoppel

Finally, Alegent argues that the Secretary must be estopped from denying DGME and IME reimbursement, because plaintiff relied—to its detriment—on the fiscal intermediary's representation that a written affiliation agreement was not necessary. *See* Pl.'s Mot. at 39. This argument fails for two reasons. First, the Appropriations Clause of the United States Constitution bars plaintiff's estoppel claim. Second, Alegent cannot show reasonable reliance upon the intermediary's representation as a matter of law.

As to the first, the Supreme Court has never held that equitable estoppel applies against the government for denying the payment of money, and has reversed every such finding of estoppel against the government that it has reviewed. *See OPM v. Richmond*, 496 U.S. 414, 427 (1990). In *Richmond*, for example, the Court held that the Appropriations Clause of the Constitution limited the "[p]ayments of money from the Federal Treasury . . . to those authorized by statute, and erroneous advice given by a Government employee to a benefits claimant cannot estop the Government from denying benefits not otherwise permitted by law." *See id.* at 414. The Court went on to say that "[r]ecognition of equitable estoppel could render the Appropriations Clause a nullity if agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury contrary to the wishes of Congress." *Id.* at 415. The Secretary's determination here that Alegent did not qualify as an affiliated group for fiscal years 2002 and 2003 for failure to submit a written affiliation agreement is not only

19

supported, but required by the BBA and its implementing regulations. *See* 42 C.F.R. § 413.86(b) (1997); 63 Fed. Reg. 26318, 26338-26339, 26341. Therefore, any claim seeking to obtain DGME and IME payments above and beyond those related to Alegent's individual FTE cap for fiscal years 2002 and 2003 would implicate payments not authorized by Congress and in violation of the Appropriations Clause.

Even assuming, however, that Alegent's equitable estoppel claim was appropriate in this situation, it would still fail because plaintiff cannot show reasonable reliance as a matter of law. Indeed, because the Secretary could reopen any reimbursement determination within three years of the date of the NPR in order to make appropriate adjustments, *See* 42 C.F.R. § 405.1885, Alegent's reliance upon the intermediary's decision could not be considered reasonable until the three-year period in which it could be reopened had passed. Of course it never did here.

## CONCLUSION

Thus, for all of the foregoing reasons, the Court GRANTS defendant's Motion for Summary Judgment and DENIES plaintiff's Motion for Summary Judgment. An Order consistent with this decision accompanies this Memorandum Opinion.

/s/ Richard J. Leon
RICHARD J. LEON
United States District Judge